UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | No. 03-CR-0126 |
| | ) | |
| ROSS A. CAPUTO, et al. | ) | Judge Ruben Castillo |

## MEMORANDUM OPINION AND ORDER

Defendants Ross A. Caputo and Robert M. Riley ("Defendants") have filed two motions

in limine seeking to exclude certain evidence from trial.[1] First, Defendants have moved to

exclude the testimony of patients and doctors regarding eye injuries allegedly caused by the

Plazlyte sterilizer and to exclude patient records documenting those injuries. (R. 157-1.)

Second, Defendants have moved to exclude the expert testimony of Dr. Shayne Gad, a

toxicologist who would testify regarding—among other things—information about eye injuries

and blue-green residue that was available during the relevant time[2] and the adequacy of the steps

Defendants took to determine the safety of their sterilizer. (R. 147-1.)

At trial, the Government intends to show that Defendants knew about the presence of

blue-green residue on eye instruments processed in their sterilizer during the relevant time period

and that they knew about serious eye injuries that occurred at various hospitals that used the

sterilizer. (R. 161, Gov't's Obj. at 2 n.1.) The Government will also submit evidence that the

---

[1] A description of the factual background of this case can be found in this Court's previous opinions, *United States v. Caputo*, 288 F. Supp. 2d 912 (N.D. Ill. 2003), and *United States v. Caputo*, 313 F. Supp. 2d 764 (N.D. Ill. 2004).

[2] The "relevant time" for purposes of this opinion is the time during which Defendants marketed the Plazlyte sterilizer: specifically, prior to March 31, 1998. (*See* R. 129, 11/10/04 Order.)

FDA repeatedly warned Defendants about inadequate information regarding their sterilizer and ordered them not to market it. (*Id.* at 9.) Defendants plan to defend against the charges by submitting evidence that they were acting in good faith throughout the time that they marketed the Plazlyte sterilizer. (R. 175, Defs.' Reply at 2.)

Defendants' principal objection to the evidence addressed in the current motions is based on relevance. Defendants argue that the disputed evidence has no bearing on their intent to defraud the Food & Drug Administration ("FDA") because they were not aware of that evidence when they marketed the sterilizer. The Government argues that the disputed evidence is relevant to show that Defendants intentionally avoided information about the potential safety hazards of the Plazlyte sterilizer, and therefore acted in bad faith. The Government plans to request a conscious avoidance of knowledge jury instruction, which is commonly known as the "ostrich instruction." *United States v. Nobles,* 69 F.3d 172, 184 n.11 (7th Cir. 1995). A brief discussion of the legal standards for the ostrich instruction is thus a necessary foundation to our determination of the relevance of the Government's proposed evidence.

"An ostrich instruction informs the jury that actual knowledge and deliberate avoidance of knowledge are the same thing." *United States v. Ramsey,* 785 F.2d 184, 189 (7th Cir. 1986). The ostrich instruction essentially "states that a person cannot avoid the 'knowingly' requirement of a crime by consciously avoiding the truth" about a set of circumstances and then claiming that "their actions arose through ignorance, accident or mistake." *Nobles,* 69 F.3d at 185 (quotation omitted). This instruction is appropriate for cases in which "there is evidence that the defendant, knowing or strongly suspecting that he is involved in shady dealings, takes steps to make sure that he does not acquire full or exact knowledge of the nature and extent of those dealings."

2

*United States v. Giovannetti*, 919 F.2d 1223, 1228 (7th Cir. 1990).

The ostrich instruction is not appropriate where the prosecution only presents evidence that "a reasonable man who knew what [the defendant] knew would have inquired further and discovered the illegal activity[.]" *Id.* at 1227-28. In other words, mere negligence in discovering harmful information or failure to display curiosity does not warrant the ostrich instruction. *Id.*; *see also United States v. Draves*, 103 F.3d 1328, 1333 (7th Cir. 1997). Instead, avoidance of knowledge must be established by evidence that the defendants took steps to actively avoid accessing damaging information or that they cut off their "normal curiosity by effort of will." *Giovannetti*, 919 F.2d at 1229. The Government may establish actual avoidance through circumstantial evidence that makes it "reasonable for a jury to infer that [the defendant] either actually knew or had strong suspicions of wrongdoing yet consciously avoided the possibility of fraud." *Draves*, 103 F.3d at 1334; *see also United States v. Graffia*, 120 F.3d 706, 713 (7th Cir. 1997) (noting that it was not an abuse of discretion to give an ostrich instruction where the government presented circumstantial evidence of knowledge that should have prompted the defendants to pursue further investigation of wrongdoing).

It is not our task at this stage in the case to determine whether an ostrich instruction will be warranted at the conclusion of this trial. In resolving the current motions, however, we will consider the standards for the ostrich instruction as set forth above to determine whether the Government is entitled to introduce the disputed evidence to lay the groundwork for that instruction. We now turn to the arguments particular to each motion.

3

**I.     Defendants' Motion in Limine to Exclude Testimony of Patients and Doctors and Patient Records**

Defendants' April 15, 2005 motion in limine seeks to preclude the Government from introducing the following evidence at trial: (1) the testimony of patients who suffered eye injuries allegedly caused by the Plazlyte sterilizer; (2) the testimony of doctors and hospital personnel who treated those patients; and (3) patient records of those who suffered eye injuries. (R. 158, Defs.' Mem. at 1.) In its objections to this motion the Government stated that it does not plan to offer patient files into evidence, so we must only determine whether to exclude the patients' and doctors' testimony. (R. 172, Defs.' Obj. at 3.) Defendants argue that this evidence should be excluded because it is outside the scope of our November 10, 2004 Order admitting evidence of eye injuries, because it has no probative value, and because, pursuant to Federal Rule of Evidence 403, any probative value it may have is outweighed by its prejudicial effect. (R. 158, Defs.' Mem. at 1.)

**A.     This Court's November 10, 2004 Order**

In our November 10, 2004 Order modifying our denial of Defendants' motion in limine to exclude all evidence of eye injuries, we noted that evidence showing that Defendants were aware of eye injuries before March 31, 1998 is relevant to whether or not they acted in good faith. (R. 129, 11/10/04 Order.) We then stated that the Government would be permitted "to introduce any eye injury evidence known to Defendants on or before March 31, 1998." (*Id.*) Defendants argue that pursuant to that Order, the only evidence of eye injuries that the Government may introduce is the particular evidence which was actually known to Defendants prior to March 31, 1998. (R. 158, Defs.' Mem. at 2-3.) It follows, Defendants argue, that patient or doctor testimony about

4

eye injuries is only permissible if Defendants spoke to those individuals prior to March 31, 1998. (*Id.* at 3.)

Defendants' stilted interpretation of our prior order disregards this Court's explanation of allowable eye injury evidence in our January 12, 2005 Order denying Defendants' motion to clarify the November 10, 2004 ruling. (*See* R. 144, 1/12/05 Order.) In the January 12, 2005 Order, we made it clear that our November 10, 2004 order did not address the nature of the eye injury evidence that the Government could introduce. Instead, it set a temporal limit on eye injury evidence:

> [w]e excluded post-March 31, 1998 eye-injury evidence under Rule 403 because it is only minimally probative of Defendants' state of mind at the time they were selling the device. Pre-March 31, 1998 eye-injury evidence, however, is highly probative of Defendants' state of mind during that time period, so we did not exclude that evidence under Rule 403.

(*Id.* at 4.) We further stated that "our November 10, 2004 minute order . . . only excludes post-March 31, 1998 eye injury evidence." (*Id.* at 5.) Our prior orders were designed to place a temporal cut-off on the eye injury evidence that the Government may present at trial. Neither our November 10, 2004 Order nor our January 12, 2005 Order excludes the *type* of evidence the Government may present regarding eye injuries that Defendants were aware of during the relevant period. As a result, the testimony of patients who incurred eye injuries prior to March 31, 1998 and the testimony of their treating doctors or other health personnel is not excluded by our November 10, 2004 Order.

## B.     The Probative Value of Patient and Doctor Testimony

Defendants argue that testimony by injured patients and their doctors "does nothing to make it more or less likely" that they are guilty of the charged offenses. (R. 158, Defs.' Mem. at

3.) We disagree. We have already found on two occasions that eye injury evidence is relevant to whether or not Defendants acted in good faith. (R. 129, 11/10/04 Order; R. 144, 1/12/05 Order.) In particular, we have found that "Defendants' knowledge that the modified sterilizer may have caused eye injuries is highly probative of whether they acted in good faith when marketing and selling the modified sterilizer." (R. 129, 11/10/04 Order.)

Testimony from injured patients and their doctors regarding the manifestations, nature, and extent of their eye injuries is probative of whether Defendants actually avoided available knowledge during the relevant time period, which is sufficient to establish Defendants' knowledge. *Ramsey*, 785 F.2d at 189. The Government expects to show that Defendants were notified that eye injuries had occurred at hospitals that used its sterilizer, but that they deliberately avoided learning about the nature or extent of those injuries in an attempt to continue to market their sterilizer without incurring liability. (R. 172, Defs.' Obj. at 4.) In order to show that Defendants actually avoided knowledge about the extent and nature of eye injuries, the Government will have to demonstrate that this information was available and accessible during the relevant time period. As the prosecution in *Nobles* had to demonstrate that the defendant's bag contained cocaine to establish his actual avoidance of knowledge of the bag's contents, *see* 69 F.3d at 185, here the Government must establish that serious eye injuries existed during the relevant time period to establish that Defendants actually avoided that knowledge so they could continue marketing their sterilizer. Patient and doctor testimony would establish the serious nature of the reported injuries. Thus this testimony is probative because it helps to lay the Government's foundation for an ostrich instruction.

We emphasize, however, the Seventh Circuit's requirement that the Government

6

demonstrate Defendants' actual avoidance by some physical act or by a conscious mental effort, such as shutting down their normal curiosity. *Giovannetti*, 919 F.2d at 1229. Patient and doctor testimony is evidence that the harmful information existed, but the Government will be required to provide at least circumstantial evidence of Defendants' deliberate avoidance of that information to warrant an ostrich instruction. We also reiterate that the only relevant eye injury evidence is that which was available prior to March 31, 1998. While doctors are free to testify regarding the type and degree of eye injury that they observed and treated prior to that date, they will not be permitted to describe injuries, diagnoses, or treatments that arose after that date.

## C. The Prejudicial Effect of Patient and Doctor Testimony

Federal Rule of Evidence 403 states that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Defendants argue that even if patient and doctor testimony regarding eye injuries has probative value, that value is outweighed by its prejudicial effect. (R. 158, Defs.' Mem. at 5.) Defendants argue that the evidence will "sensationalize the case," and that the testimony of injured patients who are military veterans would inflame the jurors' emotions. (*Id.*)

We agree that the presence and testimony of partially-blinded veterans could cause a distracting emotional reaction in the jury that could improperly influence their decision regarding Defendants' guilt on the regulatory fraud charges. Though there is some probative value in the patients' testimony given the Government's intent to establish Defendants' actual avoidance of knowledge regarding the nature and extent of eye injuries, the Government can also establish that

7

fact through the testimony of doctors and hospital personnel who observed and treated those patients. Treating physicians and personnel could give first-hand accounts of what they observed about the effect of the patients' injuries. Allowing patients and doctors to testify about the same injuries may be largely cumulative, which reduces the probative value of the potentially prejudicial patient testimony. We thus find pursuant to Rule 403 that the danger that the jury will be prejudiced by patient testimony regarding eye injuries substantially outweighs the probative value of that evidence and will be excluded.

We disagree, however, with Defendants' argument that the testimony of treating physicians is overly prejudicial. (R. 158, Defs.' Mem. at 5.) The risk of prejudice is greatly diffused when a doctor gives a clinical assessment of the injuries that she observed and treatment she prescribed. Allowing doctors to inform the jury regarding the nature and extent of the injuries will allow the Government to introduce those facts without the undue risk of prejudice attendant to the patients' testimony. The Government has represented that this testimony would take up no more than one or two days of what is likely to be a several-weeks long trial. (R. 172, Gov't's Obj. at 7.) Given that representation we find there is little risk that the disputed testimony will unduly delay the proceedings. Because the probative value of the testimony of doctors and hospital personnel who treated the injured patients outweighs any risk of prejudicial effect, Defendants' motion to exclude the testimony of treating doctors is denied.

## II.  Defendants' Motion in Limine to Exclude the Expert Testimony of Dr. Shayne Gad

On January 20, 2005, the Government gave defendants Ross A. Caputo and Robert M. Riley ("Defendants") notice of its intent to call toxicologist Dr. Shayne Gad as an expert witness

at trial.[3]  (R. 147, Defs.' Mot., Ex. A, Notice.)  In response, Defendants filed the present motion

in limine seeking to exclude Dr. Gad's testimony.  (R. 147-1.)  After Defendants filed their

motion, on April 18, 2005 the Government sent Defendants an updated notice which included a

revised summary of Dr. Gad's proposed testimony.  (R. 161, Gov't's Obj., Ex. A, Revised

Notice.)  The revised notice indicates that Dr. Gad would testify about the availability of

information regarding blue-green residue and eye injuries.  (*Id.*, Ex. A, Revised Notice at 1-2.)

Dr. Gad would also give his opinion regarding the adequacy of AbTox's safety testing and

reporting to the FDA.  (*Id.*, Ex. A, Revised Notice at 2.)  Defendants seek to exclude Dr. Gad's

testimony in its entirety.  (R. 175, Defs.' Reply at 1-3.)  We agree with Defendants that certain

categories of Dr. Gad's proposed testimony must be limited to ensure its reliability and

relevance, but we decline to exclude his testimony in its entirety.

## A.     Legal Standards

The admissibility of expert testimony is governed by Federal Rule of Evidence 702.

Expert testimony is admissible if it "will assist the trier of fact to understand the evidence or to

determine a fact in issue" and if the "witness [is] qualified as an expert by knowledge, skill,

experience, training, or education."  Fed. R. Evid. 702.  Rule 702 also requires that expert

testimony is based upon sufficient facts or data and is the product of reliable principles and

methods, and that the witness "has applied the principles and methods reliably to the facts of the

case."  *Id.*; *see also United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005).  It is the Court's

task to ensure that expert testimony is both reliable and relevant.  *Daubert v. Merrell Dow*

---

[3]This notice supplemented the Government's November 29, 2004 preliminary disclosure
of Dr. Gad's testimony.  (R. 147, Defs.' Mot., Ex. B, Preliminary Notice.)

*Pharm., Inc.*, 509 U.S. 579, 597 (1993).

The Court has broad latitude to decide how to determine reliability, *Kumho Tire Company, Limited v. Carmichael*, 526 U.S. 137, 141-42 (1999), but we must ensure that the expert is qualified to testify and that any opinion is based on sound principles and methodology, Fed. R. Evid. 702; *United States v. Conn*, 297 F.3d 548, 555 (7th Cir. 2002). To determine whether expert testimony is relevant, the Court simply asks whether it will "assist the trier of fact" to reach a conclusion on any factual issue involved in the case. Fed. R. Evid. 702; *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). Our gate-keeping function includes keeping "experts within their proper scope, lest apparently scientific testimony carry more weight with the jury than it deserves." *DePaepe v. General Motors Co.*, 141 F.3d 715, 720 (7th Cir. 1998).

## B.     Analysis

The Government argues that Dr. Gad's testimony is necessary to help the jury evaluate whether Defendants acted in a manner "consistent with honest or common business practices[.]" (R. 161, Gov't's Objections at 3.) In seeking to exclude Dr. Gad's testimony, Defendants separate his proffered testimony into four broad categories: (1) Dr. Gad's opinions about what was "commonly known," "available," or "obvious"; (2) Dr. Gad's criticism of the safety testing conducted by or on behalf of AbTox; (3) Dr. Gad's opinion that soap did not cause the relevant eye injuries; and (4) Dr. Gad's "legal conclusions" regarding AbTox's reporting obligations. (R. 175, Defs.' Reply at 3-14.) We will address each category in turn.

### 1.     Dr. Gad's Opinion About Information That Was "Commonly Known," "Available," or "Obvious"

Defendants object to Dr. Gad testifying "that the off-label use of the AbTox sterilizer to

process instruments containing brass including, without limitation, eye instruments, caused potentially harmful residues, which were *commonly known* to damage ocular tissue, to precipitate on instruments containing brass." (*Id.* at 3 (quoting R. 161, Gov't's Obj., Ex. A, Revised Notice at 1).) They also object to Dr. Gad testifying "about what information was 'available to defendants . . .' that the safety testing conducted by or on behalf of AbTox 'did not address the obvious problem . . .' and that Technical Note 13 'ignored an obvious potential problem with ocular tissue.'" (*Id.*) Defendants argue that this testimony is neither reliable nor relevant. (*Id.*)

To gauge the reliability of Dr. Gad's testimony, we must first determine if he is "qualified as an expert by knowledge, skill, experience, training, or education[.]" Fed. R. Evid. 702. Dr. Gad's lengthy resume reflects his twenty-eight years of experience in the field of toxicology, which includes his participation in the preparation of numerous 501(k) pre-market notifications, his involvement in safety, toxicity, and health effects tests related to products including medical devices, and his experience with device safety assessments. (R. 161, Gov't's Obj. at 5 & Ex. A, Gad Resume.) Dr. Gad has also published numerous articles and books on matters involving toxicology and product safety and has been involved in numerous trade association committees and professional societies dealing with toxicology and product safety. (*Id.*, Ex. A, Gad Resume at 3-4, 8-9.) We find that his extensive experience in the field of toxicology more than qualifies Dr. Gad to testify regarding what information was "commonly known," "available," or "obvious" to other individuals engaged in matters involving the intersection of toxicology and product safety during the relevant time period. *See Kumho*, 526 U.S. at 152 (noting that expert testimony can be based on "professional studies or personal experience"); *Smith*, 215 F.3d at 718 (stating that Rule 702 specifically contemplates testimony by experts whose knowledge is based on

11

experience).

The reliability analysis also requires us to consider whether Dr. Gad's proffered testimony is based on reliable principles and methods. *Conn*, 297 F.3d at 555. In making this determination, we are "free to fashion an approach [that is] precisely tailored to an evaluation of the particular evidentiary submission" before us. *Id.* at 556. Here Dr. Gad proposes to testify that certain information about eye injuries and blue-green residue was "commonly known," "available," or "obvious" at the relevant time. The Government has represented that this testimony will be based on his review of AbTox records, studies, and toxicological literature as well as his own extensive education and experience in the relevant field. (R. 161, Gov't's Obj. at 1, 6.) We find that for a person with Dr. Gad's level of experience, the review of records, studies, and literature available during the relevant time period presents a sound methodology by which Dr. Gad may determine what information was known, available, or obvious to persons involved in product safety assessments. *Conn*, 297 F.3d at 555; *see also Spearman Indus., Inc. v. St. Paul Fire & Marine Ins. Co.*, 138 F. Supp. 2d 1088, 1098 (N.D. Ill. 2001) (finding methodology of expert's testimony was sufficient when based on a combination of first-hand observation and extensive experience in the field). As a result, we find that Dr. Gad's proffered testimony regarding what was commonly known, available, and obvious prior to March 31, 1998 is reliable.

We also find that Dr. Gad's testimony is directly relevant to the central issue of whether or not Defendants acted in good faith. As the Government points out, a determination of whether Defendants acted in good faith requires the fact-finder to determine whether they responded to the injury evidence and warnings in a manner that was consistent with the honest or common

12

business practices that existed at the time. (R. 161, Gov't's Obj. at 3.) This testimony is also relevant to the Government's position that Defendants deliberately avoided knowledge they believed threatened their ability to market the sterilizer. In order to make that showing, the Government must demonstrate what knowledge existed at the time. Testimony that certain information was readily available and that Defendants did not access it makes it more likely that they deliberately avoided that information than if the information was difficult to access. Dr. Gad's testimony on this point is thus relevant because it will directly assist the trier of fact in determining a central issue to the case: whether Defendants responded in a reasonable manner to evidence of eye injuries and warnings from the FDA. Fed. R. Evid. 702.

Though we will not exclude Dr. Gad's testimony on this topic, we will limit the scope of his testimony. Dr. Gad may only testify about information that was commonly available prior to March 31, 1998. It will not be sufficient for Dr. Gad to inform the jury of what is now "obvious" to him based on hindsight, because the only relevant information is that which was available to Defendants when they were marketing the sterilizer. Nor will Dr. Gad be permitted to speculate regarding Defendants' state of mind during the relevant period, including whether Defendants deliberately avoided available information.

We also note that our ruling requires a modification of our October 26, 2004 order granting the Government's motion to exclude:

> Any lay or expert opinion which is based on literature, analysis, or testing conducted prior to [March 31, 1998], which was not known to the defendants or their employees, and which could therefore not have been relied on by the defendants in forming their good faith belief[.]

(R. 124, 10/26/04 Order.) That order is modified to allow Dr. Gad's opinion based on literature

13

or testing that he finds was commonly known, available, or obvious during the relevant period, whether or not it was actually known to the Defendants during that period. At trial, Defendants may bring their own witness to challenge the credibility of Dr. Gad's conclusions about what information was "commonly known," "available," or "obvious" during the relevant time period. Any expert Defendants use to challenge Dr. Gad's testimony may introduce evidence of information that Defendants were not aware of that supports Defendants' position, as long as that information is submitted to challenge the credibility Dr. Gad's findings and not to prove Defendants' subjective state of mind.

## 2. Dr. Gad's Criticism of the Safety Testing Conducted By or On Behalf of AbTox

Defendants object to Dr. Gad's proffered testimony regarding the adequacy of AbTox's testing of the safety of its sterilizer. (R. 175, Defs.' Reply at 7-10.) Defendants do not challenge the reliability of this testimony. Because it is based on a combination of Dr. Gad's experience with safety, toxicity, and health effects tests related to medical devices and his professional review of AbTox's records, (see R. 161, Gov't's Objections at 5-6), we find that it meets the Rule 702 reliability requirements. Defendants argue, however, that Dr. Gad's criticism of AbTox's safety testing is irrelevant "[u]nless the Government first presents evidence that Defendants knew of the alleged deficiencies in the investigation and testing, purposefully hired inept scientists, or directed the scientists to ignore potential safety concerns[.]" (R. 175, Defs.' Reply at 7.)

A core question that the jury will be asked to consider in this case is whether Defendants responded in good faith to information in their possession about the existence of blue-green

14

residue on medical instruments and eye injuries. Dr. Gad's proffered testimony will assist the jury in making this determination by explaining industry practices regarding safety testing and clarifying scientific and technical safety test records and reports that might be difficult for a jury to decipher on its own. The Government intends to show that Defendants were warned by the FDA about potential problems with the AbTox sterilizer, but that they insisted that their tests were adequate and showed their product was safe. (R. 161, Gov't's Objections at 9.) Expert testimony that those tests were inadequate directly rebuts Defendants' justification for ignoring the FDA's warnings. Thus, Dr. Gad's testimony is directly relevant to whether or not Defendants acted in good faith or deliberately avoided information in failing to comply with the FDA's requests not to market the uncleared sterilizer.

Turning to the specific concerns set forth in Defendants' reply brief, we find that Dr. Gad's criticism of the adequacy of a literature search that Dr. Thrash appended to a safety report is relevant. (R. 175, Defs.' Reply at 8.) Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. If the evidence shows that Defendants unquestioningly relied on scientists whose work was inadequate, that would make it more likely that Defendants did not act in good faith than if the opposite were true. Thus Dr. Gad's criticism of Dr. Thrash's report is relevant.

Similarly, we find relevant Dr. Gad's opinion that Dr. Reno's report is inadequate in part based on Riley's failure to inform Dr. Reno that the sterilizer would be used to process instruments used for purposes other than body cavity incision. (R. 175, Defs.' Reply at 9.) Dr. Gad's experience in the field of toxicology and product safety qualify him to give an opinion

15

based on what information should be provided to testing scientists in the ordinary course of business, and based on his review of the AbTox reports, he would be equipped to testify as to whether Riley met those obligations. That this purported information gap could have contributed to inadequate safety testing results is highly relevant to whether Riley conducted himself in good faith.

Finally, Dr. Gad's testimony that AbTox should have conducted ocular irritation studies on brass instruments and that NAmSA's ocular irritation study on stainless steel instruments was inadequate are also relevant to whether Defendants conducted themselves in good faith. (*See id.* at 10.) Without the benefit of an expert's explanation, it would be difficult for the jury to assess whether AbTox's testing represents a good faith effort to understand the sterilizer's potential safety issues. Dr. Gad's testimony regarding the accuracy of these studies or failure to conduct certain indicated studies is helpful to the average juror in assessing whether Defendants consciously avoided information about the harmful effects of their device.

Though we find that Dr. Gad's criticism of AbTox's safety testing is relevant, we also find that its scope should be limited. Dr. Gad's opinion regarding the sufficiency of AbTox's testing must arise from information or testing techniques that were available to Defendants prior to March 31, 1998. Any post-hoc criticism based on information that has evolved since that time sheds no light on whether Defendants acted in good faith at the time they marketed the sterilizer. Again, Defendants may call their own expert to challenge Dr. Gad's criticisms of their safety testing. Furthermore, proper jury instructions will explain how the Government must prove an intent to defraud.

### 3. Dr. Gad's Opinion That Soap Did Not Cause Eye Injuries

Defendants object to Dr. Gad's proposed testimony that "the literature relied on by AbTox to argue that soap was responsible for the eye injuries is cited selectively, does not support AbTox's conclusion, and has the effect of shifting attention away from the blue-green residue problem." (R. 175, Defs.' Reply at 11-12) (quoting R. 161, Gov't's Obj., Ex. A, Revised Notice at 4.) They also object to Dr. Gad opining that commercial soaps ordinarily would not cause the kinds of eye injuries that were reported to Defendants. (*Id.* at 11.) Defendants raise two reliability arguments against this testimony. First they argue that Dr. Gad's expertise as a toxicologist does not give him any insight into whether Defendants selectively chose literature to support the link between soap and eye injuries. (*Id.*) We agree that Dr. Gad may not speculate about whether Defendants intentionally omitted materials that did not support their position. As we noted in Section I above, however, Dr. Gad's expertise and professional review of scientific literature available during the relevant time period presents a reliable basis from which he may give an opinion about what literature was readily accessible at that time.

Second, Defendants suggest that Dr. Gad does not have the expertise necessary to distinguish the kinds of eye injuries caused by soap from the kinds of eye injuries caused by blue-green residue. (*Id.*) On the contrary, Dr. Gad's resume expressly conveys his experience in matters involving ocular irritants, including his role in analyzing the safety of medical devices. (R. 161, Gov't's Objections, Ex. A, Gad Resume.) Specifically, Dr. Gad's resume lists numerous publications demonstrating his knowledge of eye irritants and injuries.[4] Dr. Gad has

---

[4]These publications include a book titled "A Critical Appraisal of Alternatives to the Rabbit Eye Irritant Test," book chapters titled "Alternatives to In Vivo Eye Irritation Tests" and "Ocular and Dermal Studies," and journal articles including "Correlation of Ocular and Dermal

17

also given numerous presentations on this subject.[5] (*Id.*) We find that Dr. Gad's resume adequately reflects his expertise to discuss eye irritants and their corresponding injuries. Defendants are free to attack the credibility of those determinations at trial, and the weight given to Dr. Gad's opinions will be decided by the jury. *See United States v. Madoch*, 935 F. Supp. 965, 971 (N.D. Ill. 1996). We find, however, that Dr. Gad's testimony regarding eye injuries meets the reliability requirements of Rule 702.

In addressing relevance, Defendants correctly point out that the cause of the eye injuries is not an issue in this case. (R. 175, Defs.' Reply at 11.) What is relevant, however, is whether Defendants could have concluded in good faith—in the face of FDA warnings about their sterilizer—that soap was the cause of the eye injuries. Dr. Gad's testimony will assist the jury in making this determination. Dr. Gad's opinion regarding the availability of information demonstrating that soap was not the source of eye injuries is probative of whether Defendants acted in good faith in ruling out their sterilizer as the source of the reported problems. His opinion that the sources cited by AbTox—and relied on by Defendants—to conclude that soap was the cause of the eye injuries do not in fact support that conclusion is similarly helpful to the jury in determining whether Defendants arrived at those conclusions in good faith.

We again stress that Dr. Gad's opinion is only relevant to the extent that it is based on

---

Irritancy of Industrial Chemicals and Considerations in Dermal Irritancy Testing," "Importance of Early Ocular Examination to Detect Transitory Irritation" and "Primary Eye Irritation Assessments in Rabbits of Four Searle Compounds." (*Id.* at 12-22.)

[5] These presentations include "Dermal and Ocular Irritancy of Industrial Chemicals," "An Evaluation of Alternatives to the Draize Eye Test," "Comparative Forms and Objectives of Draize Eye Test," "Alternatives to In Vivo Eye Irritation," and "An 11-Company Evaluation of Alternatives to the Eye Irritation Test Using Chemical Intermediates." (*Id.* at 22-31.)

information that was available to Defendants at the relevant time period. He will not be permitted to base any conclusions on information that was available only after March 31, 1998.

## 4. Dr. Gad's "Legal Conclusions"

Defendants also object on both reliability and relevance grounds to what they characterize as Dr. Gad's offer of legal conclusions. (*Id.* at 13-14.) Defendants object to two statements in the Government's notice summarizing Dr. Gad's testimony. First, Defendants object to Dr. Gad testifying that "AbTox was obliged under standards in the industry, including the Safe Medical Device Act of 1990, to determine whether the product *as used* was safe." Second, they object to Dr. Gad testifying that "Technical Note 13 was materially misleading."[6] (*Id.* at 13; R. 161, Gov't's Obj., Ex. A, Notice at 2-3.)

Defendants correctly assert that an expert must not "improperly tell the jury why [a party's] conduct was illegal." *Niebur v. Town of Cicero*, 136 F. Supp. 2d 915, 920 (N.D. Ill. 2001) (quoting *Haley v. Gross*, 86 F.3d 630, 645 (7th Cir. 1996)). While an expert may testify regarding industry standards and practices, he may not offer opinions that amount to legal conclusions. *West By and Through Norris v. Waymire*, 114 F.3d 646, 652 (7th Cir. 1997); *McCabe v. Crawford & Co.*, 272 F. Supp. 2d 736, 740 (N.D. Ill. 2003) (noting that expert may not expound on whether actions comply with statutory requirements). As a result, Dr. Gad may not testify about whether Defendants met their obligations under the Safe Medical Devices Act of 1990, because such testimony would constitute an impermissible legal conclusion. For the same reason, Dr. Gad may not summarily testify that Technical Note 13 was "materially misleading"

---

[6]AbTox Technical Note 13 is a document that AbTox issued to its customers explaining the Plazlyte sterilization process. (*See* R. 139, Gov't's Obj. to Defs.' Mot. to Clarify Ruling at 3 & Ex. 7, AbTox Technical Note 13.)

within the meaning of any statute or regulation.

We will allow Dr. Gad to give his opinion — provided it is based on information that was available prior to March 31, 1998 — that Technical Note 13 "was wholly inadequate to warn purchasers of the risks posed by blue-green residue and ignored an obvious potential problem with ocular tissue." (R. 161, Gov't's Obj., Ex. A, Revised Notice at 3.) This is not a legal conclusion, but rather an opinion based on Dr. Gad's expertise and experience in the industry that is directly relevant to whether Defendants responded to potential hazards with its sterilizer in good faith. Similarly, Dr. Gad may give his opinion that industry standards at the time required companies such as AbTox to determine whether their products were safe as used. *See, e.g., Cook v. Navistar Int'l Transp. Corp.*, 940 F.2d 207, 213 (7th Cir. 1991) (noting with approval district court's allowance of expert testimony regarding industry standards and practices as a basis for jury to believe the defendant had notice of prevailing standards). This is precisely the kind of information that can assist the average juror in understanding whether Defendants' actions complied with standard practices, which could help them determine the ultimate issue of Defendants' intent.

We agree with Defendants that the Government has not established Dr. Gad's expertise in the area of legal analysis or reporting obligations. As we have excluded such testimony, we need not hold a *Daubert* hearing on the matter. Dr. Gad's testimony regarding the adequacy of Technical Note 13 and industry practices regarding testing is reliable because it is based on Dr. Gad's extensive experience in the field of toxicology as well as his expert review of AbTox's files and literature available during the relevant time period. Because this line of testimony meets both the reliability and relevance requirements, we decline to exclude it.

## CONCLUSION

Defendants' motion in limine to exclude the testimony of patients and doctors and patient records is granted in part and denied in part as described above. (R. 157-1.) Defendants' motion in limine to exclude the testimony of Dr. Shayne Gad is also granted in part and denied in part as described herein. (R. 147-1.) We also modify our October 26, 2004 Order to allow Dr. Gad to give an opinion based on the general scientific information that existed prior to March 31, 1998 that is relevant to the adequacy of the safety analysis conducted with respect to the AbTox product. (R. 124.)

ENTERED:

**Judge Ruben Castillo**
**United States District Court**

**Dated: June 16, 2005**